Good morning. May it please the court, my name is Anthony Goles. I represent the defendants of Helen's Trojan E.V. LLC and Golf Carts of Cypress LLC. The district court committed clear error in finding that there is a likelihood of confusion and in its findings on the six digits of confusion addressed in our briefing. So I'll tell you what I'm asking for. We want the court to reverse and render a judgment that plain of take nothing. Now in my time today I'd like to address the two digits of confusion that this court has said has special importance. The six digit being the defendants' intent and the seventh digit being actual confusion. And I want to start with sixth, the defendants' intent. And I'd like to note three points for the court. The circumstances of this case are exactly what this court cautioned against in the Amstar opinion, that's the Domino's Pizza opinion. And in that opinion this court said that when a district court mechanically adopts verbatim the findings proposed by a party that this court can feel confident that the evidence was not properly considered. And with respect to this particular digit we pointed this out in our briefing, only a single phrase was changed. Apart from deleting citations to the trial record, the district court changed the phrase compels the conclusion to supports the strong inference. Otherwise the findings proposed by the plaintiff are identical and were adopted by the district court. So that's the first point. The second point I'd like to make on this digit is that there are two legal errors underpinning the district court's analysis on these findings. And I'll point you to those errors. The first error you can see in finding, actually I think it's more properly conclusion 102, where the court found that merely because the defendants were aware of the plaintiff and it's the plaintiff at the time it started selling golf carts, that that necessarily established that the purported infringement was willful. And this court's precedent is very clear. Amstar held this, the El Chico opinion held this, is that mere awareness of the plaintiff does not equal bad faith or an intent to confuse or deceive. The El Chico opinion actually has a particularly relevant passage. And we've cited El Chico in our briefing. Pinpoint site is, looks like it's 726. And in that opinion the court said, in short, although the defendants knew of the plaintiff's use of the name, they further knew that the plaintiff did not have an exclusive right to such use as against a non-competing business where there was no likelihood of confusion as to source and in the absence of an intent to benefit from the reputation or goodwill of the plaintiff. So again, mere awareness of the plaintiff does not equal bad faith. That's finding 102. The second legal error underpinning the court's analysis you can find in findings 108 and 110, where the district court in this case held that mere continued use of the mark after receipt of a cease and desist letter and after being sued, that was evidence of bad faith. And this court's opinion in streamline, as well as I think Texas Pig Banks illustrates this as well, that mere continued use of a mark does not equate to bad faith. So those are the two legal errors underpinning the analysis. The third point I'd like to make it on this digit is that the findings, especially the adverse credibility determination that was made in this case, it's not only unsupported by the cited evidence, but it also ignores the proven facts. Now what's the cited evidence? I mean, you've seen the findings. It's over a hundred pages. So is this an inch thick? There's nothing left unsaid. The plaintiff in its brief made the argument that the adverse credibility determination was based on observation of witness demeanor at trial, and it wasn't. It's based upon the cited evidence in the findings and conclusions. Now what was the adverse credibility determination? Here the defendant's principal, Mr. Nell, testified that he adopted the Trojan EV name in October of 2020, and that's also when he adopted the logo mark. The following month, a salesman for Continental Battery visited Golf Carts of Cyprus and made a sales presentation. He was told by the Golf Carts of Cyprus representative, Mr. Fuentes, that they used only interstate batteries and weren't interested in changing, whereupon the Continental Battery salesman informed them that the plaintiff manufactures not only Trojan branded batteries, but also Continental batteries and interstate batteries, and he followed up the sales presentation with a price quote via email, which is in the record, quoting prices for each of the, for Continental batteries, Trojan batteries, and I think US batteries. Now the plaintiff says, and the district court found, that the email response a day later necessarily showed that Mr. Nell was not being truthful in his testimony, because nowhere in the four corners of the response email did he ask anything, or did Golf Carts of Cyprus ask anything about the plaintiff, and we would submit that nothing within that documentary evidence on which that adverse credibility determination is based, supports the adverse credibility determination, and this court's opinion in Lohr Brothers, which we cited in our briefing as well, provides an example of this court disturbing a lower court's adverse credibility determination based upon the documentary evidence, which is exactly what we have here. It is simply unsupported. Now, failing that documentary evidence, the only other evidence they rely on is circumstantial evidence, and I would like to note that this court pointed out in the Viacom opinion, that's the Spongebob Squarepants Krusty Krab opinion, that in that case that was a summary judgment reversal, and in that case this court held that it would be improper to infer bad faith simply based upon circumstantial evidence, which is precisely what we have here. So we think that there is clear error with respect to the sixth digit of confusion, and these errors are far-reaching, because even if the court were to uphold the liability finding, the clear error on the intent digit would affect both the disgorgement award and the district court's permanent injunction, and at a minimum, if this court were to find clear error on the intent digit, I think you would have to send back, at a minimum, send back the disgorgement award and send back the permanent injunction for the district court to reconsider. Now I'd like to turn to digit 7, actual confusion, and I'd like to again make three points on this digit as well. The first point would be, I think this court's most recent opinion on this digit, surveying this court's precedence is the Rex real estate opinion, where it surveys this court's prior opinions on actual confusion, and it notes that evidence of actual confusion is treated differently depending upon the quality of the evidence. This court's Armco opinion also makes the same observation, and that you can view it as a spectrum. On one end of the spectrum, you have cases involving actual, I'm sorry, lasting confusion by actual customers, and what do I mean by that? You can look to the Armco opinion. In that case, the actual confusion evidence was that the plaintiff, once a month for I think about six years, was receiving phone calls from the defendant's customers trying to reach the defendant, but they instead were calling the plaintiff. Lasting confusion, actual customers. Another example would be Fuji. In the Fuji case, you had Fuji's, the plaintiff's United States distributors, who had attended trade shows, saw the defendant's products, and were confused and thought that they were made by the plaintiff instead. Again, a familiarity with the plaintiff's products because it was their own distributors. A third example would be the Dick Littrell's World Carpets opinion. In that case, you had the plaintiff's retailers that were calling the plaintiff to complain because it had seen the defendant's products and thought that the plaintiff had reneged on its agreement to not enter the retail market. So that's one end of the spectrum, the lasting confusion cases. The other end of the spectrum, you have short-lived confusion by individuals only casually acquainted with the businesses or products at issue. And emblematic of that, those sorts of cases, are Amstar and Sunbanks. Amstar, that's the Domino's Pizza opinion, you had, I think it was two businessmen who had initially asked whether there was a connection between the two companies. And the quality of the evidence in Sunbanks, I think, was the same. I think it involved four inquiries about whether there was a connection. So using those cases as a guidepost, we have to look at the asserted confusion evidence in this case and inquire what it more resembles. Does it more resemble the United States distributors of Fuji who were duped? Does it involve phone calls once a month from folks who were trying to reach the defendant but instead called the plaintiff? No. The asserted confusion evidence in this case is much more like Amstar and Sunbanks. And what is that confusion evidence? The district court relied on four emails that were received by Trojan EV through its Become a Dealer and the Contact Us links. And we don't have any evidence from, there was no testimony from the authors of any of those emails. So we can't say for certain why they say what they said. I think we can just take them at face value. Two of the emails reference the plaintiffs. We don't know why they do. I will note that one of the emails mentions not only the plaintiffs but also other brands as well. It seems objectively that the author is attempting to demonstrate the brands with which he deals. Not necessarily establishing confusion, but again we take it at face value. A third email mentions your batteries. Well we don't sell batteries. The plaintiff manufactures batteries. Candidly, is that evidence of confusion? I'm not sure why else they would say your battery. But we have that email. Again we don't have testimony from the author. We have that reference to your battery. The fourth does not mention the plaintiff and it asked for, it's trying to source batteries that the plaintiff doesn't even sell. But in any event, four emails. Are those emails more like Fuji and Armco and Dick Littrell's or are they more like Amstar and Sunbanks? We contend that they're more like Amstar and Sunbanks. So that there's that's the first point. Second point on this digit is that the plaintiff also relies on the concept of initial interest confusion and points to the Elvis Presley Enterprises case as an example. Now if you'll recall the Elvis Presley Enterprises case turned on the defendants advertising, right? That entire opinion is about how the district court erred and not properly considering the advertising. And what was the advertising? It was emphasizing the image, the likeness of Elvis Presley as well as using the word, his name and other words associated with Elvis. Customers of the plaintiff, based on those advertisements, were duped into walking into the defendants bar thinking that they possibly could buy Elvis Presley memorabilia, walked through the doors, had no confusion whatsoever, any purported initial confusion was dissipated. Now the court, this court said, the court didn't stop there. It wasn't merely that these folks walked through the door and because they were confused. This court noted in Elvis Presley Enterprises that the defendant, what was problematic about the confusion in that case, was that the defendant was able to obtain an economic benefit from that confusion before it could be dissipated. And the economic benefit, the court noted, was the fact that the defendant sometimes charged a cover charge for entry, meaning that the defendant pocketed money before the confusion could be dissipated. Now, with respect to initial interest confusion, the plaintiff points to the experience, not the emails, they point to the experience of a dealer, a longtime Trojan battery dealer named Bill Molloy. Bill Molloy testified that he was searching the internet because he was not searching for batteries, he was searching for golf carts to potentially sell. He encountered the Trojan EV website. He said that he initially thought that there might have been a connection between the parties. He reviewed the website, immediately knew that there was no connection. And then six weeks later, I believe it is, is when he filled out forms to potentially become a dealer for Trojan battery, or I'm And he decided not to because our golf carts were too expensive. Now, they try to liken those facts to Elvis Presley, but Elvis Presley is distinguishable for two reasons. Number one, Mr. Molloy was not a customer of the plaintiff, trying to do business with the plaintiff, but was confused into doing business with us instead. So that's number one. Number two, any assertive benefit that we obtained from the Molloy experience was long after any confusion was dissipated. So those two factors distinguish the Elvis Presley Enterprises opinion. The final point I'd like to make on this digit is this. Let's not lose sight of the fact that what a likelihood of confusion is. A likelihood of confusion is a probability of confusion. It is more than a mere possibility. Now, you'll remember I said that there were four emails that were received that they point to as evidence of actual confusion. The record also shows, however, that 1,262 total emails were received, and I've crunched the numbers. Do you know what four out of 1,262 is? All right. Mr. Goltz, I can't resist asking, what's your argument about attribution? Attribution is that attribution is a more of a causation showing and not an accounting showing. And a plaintiff... I'm sorry, Your Honor. Didn't... I mean, you said that... I need to clarify this. You said that the pattern jury charge in the Fifth Circuit requires plaintiff to bear proof of attribution, right? Is that what you said? That's correct, and it does, yes. Okay, but that's not the way it was handled here? No, it wasn't. So, the district court... the plaintiff's expert took the position that it was not his burden to make this showing, that it was only the defendant's burden. The defendants undertook that burden and met the burden, frankly, but the district court held, based on out-of- circuit law as well, that that's a defendant showing, not a plaintiff showing. And they latch on to the language in the Lanham Act regarding that the defendant's burden to prove, I think it's cost and deductions, and we contend that... Well, did you object to the jury charge? Oh, Your Honor, this was a bench trial. Oh, yeah, of course it was. But we would have, and we attached the jury... the pattern jury charges to our amended 52B motion. So, they're in the record, but we made this argument. And just shorthand, I would contend that this is a causation showing, not an accounting showing. Cost and deductions, cost of sold or cost of goods sold, deductions are things like a Maltina addresses like overhead. Overhead would be an example of a deduction that might not be a cost of goods sold, but might be permissible in the appropriate case. All right, Mr. Goetz. Judge Jones, did you have additional questions for counsel? No, sir. All right, well, he's reserved his rebuttal time. So, we'll hear from Mr. Marindola. Good morning, Your Honors. May it please the Court. Tyler Marindola for the Appellee Trojan Battery Company. I'd like to start where my friend left off, which is the attribution issue. The Lanham Act is very... and I'll actually... let me first address the pattern jury instructions. This was a bench trial, of course. The pattern jury instructions, as we say in the red brief, didn't exist at the time this case was tried. And the reason for that is they were proposed after trial by the defendant's trial counsel in an effort to improve an argument that they lost on the merits at trial. But the Lanham Act is incredibly clear. It says the burden is on the plaintiff... Well, excuse me. I mean, I'll just... I'll just interject here. There may have been intervention by plaintiff's counsel. You don't know who the committee were, and you can't say that for a fact. On the other hand, those committees are appointed and work very, very diligently to try to conform the jury instructions with their understanding of the state of the law. So, I was a little surprised that you were sort of impugning the drafters of the pattern jury instruction and the instruction itself. Certainly no intent to impugn the... the committee, Your Honor. The... the instructions that were submitted to them for consideration were the entirety of trademark law. The circuit hasn't had pattern trademark instructions on trademark law. I... I will do you one better, though, which is in support of this principle that the plaintiff bears the burden of showing that the defendant did not make profit or made profit from the mark. The... the defendants or defense counsel cited the Pebble Beach case. That's what's in the pattern jury instruction. Reading from Pebble Beach on page 555... Well, let's... let's... let's hit rewind for a moment. I mean, I know you wanted to start your argument where he ended at attribution, but I'll just say for my brain, this will work better for me to start at the starting point rather than starting at the end point. We can end up there, all right? Let's tee it off. Maybe that'll be a little bit more logical for me to follow. You know, counsel office started off, he heard the last case and he... you know, he beat on about what do you want, so he was loud and early with saying, you know, bouncing. So we didn't get anything else from him. You know, he did say that. Now, having said that, though, you know, this is a bench trial. You know, it's Judge Hanks' trademark, so I get it sometimes. You know, jury charge can be used, you know, but this is not a jury. You know, it's a judge, so it's not that they're irrelevant, but I'm not quite sure I want to go down a rabbit trail about the jury charges and all that kind of stuff because that issue is not there. So let's just lean back. I'm not saying don't talk about it, but let's start back with, you know, start at the beginning, so to Sure. The findings in this case are incredibly detailed. The court heard half a dozen witnesses... Wait a minute. The findings of the findings you proposed? In part, Your Honor, but the findings also, we asked for disgorgement of gross revenues at on the basis that the defendants had not proven up their costs. Judge Hanks went through very carefully and said, I find this deduction to be appropriate, this cost to be appropriate, and changed the findings in large part. But I think, frankly, the blue brief explains why the judge adopted our findings in large part. When you have a defendant who won't even admit that Trojan and Trojan are similar in sight, sound, and meaning, it's hard to adopt any of their because they are so, they take a trial story, or they are so far afield from what the story was at trial. And the story here on appeal is they should have believed the sole, the judge should have believed the sole witness and didn't find him credible. That's an argument that they lost, and as a result, they lost the intent factor, they lost the actual confusion factor because there is evidence of actual confusion here. And I just want to step back and give the court. Well, I want to follow up on your statement that that's why he selected your findings over their findings. Is it your impression or your understanding that when a judge asks for proposed findings and conclusions that he's going to adopt either one or the other? Absolutely not. And here, Judge Hanks changed portions of our findings where he felt it was appropriate to do so. But as a practical matter, trial judges do rely on counsel to propose findings, cite detailed testimony and evidence that support those findings. And if they're supported, there's nothing wrong with, and this Court's cases support that, adopting the findings that are correct that the judge sat through over four days of testimony and then deliberated over for about eight months before he rendered his decision. Well, four days of testimony isn't a very long trial. It's half a dozen witnesses, Your Honor, a few video depositions, and it's two experts. It was a substantial trial, and Judge Hanks had the ability to watch all of the testimony, take in all of the evidence, over 100 exhibits showing the commercial strength of the Trojan Battery brand, showing the intent to infringe. Well, let me ask you, you know, here's, well, you don't have to answer this until an appropriate time, but you're sort of saying, this, in a way, this strikes me as a David and Goliath lawsuit. A Trojan is hundreds of millions of dollars. Mr. Nell started operating out of his garage, and you're going to squash him like a bug. The injunction is affirmed, and it's sort of like saying, suppose you're a Goodyear tire company, and you make grizzly tires, and everybody thinks grizzly tires are the greatest, and then suddenly Goodyear decides to make an ATV, and you're assuming that people are going to leverage Goodyear grizzly, well, not Goodyear, but, you know, Joe blows grizzly ATV out of the Goodyear tires that are sometimes used on ATVs, and so that whole, it sounded superficially plausible, but as I thought about it more, you're really leveraging a small component of a golf cart, which is a $20,000 purchase out of the range of most of us into, you know, the sole reason why this company was able to sell some SUVs or some golf carts. I'm not assuming that, Your Honor. That's what the evidence at trial showed, that there was a connection between the two, that consumers had already perceived there to be a connection between the two. The only consumers, the only consumers referenced here are people who would have been, would have made inquiries about becoming dealers, correct? What consumer confusion did you show? Those are folks who click the Become a Dealer link are folks looking to buy Trojan golf carts, Trojan EV golf carts, so that they can sell them on to consumers. What the evidence showed here was that the three biggest purchasers, the three biggest consumers of Trojan EV golf carts were Trojan battery dealers. The evidence showed that a Trojan battery dealer went to the Trojan EV website, said, hey, thought you guys were part of Trojan battery, and then, sure, he realized when he looked at the address on the website that they were different companies, but then he stayed. He clicked the Become a Dealer link. These are not fleeting mix-ups. They're people who are clicking a link on the Trojan EV website. They're filling out a form, and they're saying, hey, we'd like to sign up with you because we are a Trojan, we know Trojan batteries, and we know they have a great profit. That's confusion. So are they a victim, or are they a participant in the confusion? They are both. So in... Well, did you have any of those people testify? I mean, you know, this is the opposite of what you expect for consumer confusion, right? You expect the consumer to buy... It's a palming off. You're arguing a palming off thing. You expect the consumer to say, I bought this because I thought it was a product of the other company. But it wasn't. But these dealers knew it was a product of the other company, and they thought, aha, we can make a profit, but you don't show a bit of ultimate consumer confusion. And how they racked up millions of dollars in sales in a couple years is sort of surprising to me, without any evidence that the end person was confused. So two points on that, Your Honor. First of all, the Court's precedents are very clear that the standard is likelihood of confusion, not actual confusion. We showed actual confusion in this case. And second of all, this is exactly the situation that the Court faced in Elvis Presley. Folks who walked into a bar named the Velvet Elvis and said immediately, oh, I know that this isn't associated with the plaintiff, but the Court explained and was correct that the damage is done at that point. That is confusion, and it's confusion among folks who are Trojan EV golf carts. Now, why do I say they're both a victim and a participant? So the victims, I think, are folks like Bill Malloy, who went to the website, thought they were part of Trojan Battery Company, and then wasted his time going through signing all their forms to get the price list. The participants are folks like Prosper Golf Carts, who the evidence showed defendant had some control over and advertised their carts in a way that would foster confusion. In our brief, we explain that every single Trojan EV listing on the Golf Carts of Cyprus website and on the Prosper Golf Carts website says Trojan and Batteries right next to each other. That is if not intent. You don't need to market a golf cart that way. That is intent to trade on the Trojan Battery name. And I don't think that you can tell the trial story here without explaining that the sole fact witness for the other side came to trial with a story, oh, I was in the golf cart business for almost two years, but I never heard of the number one name in golf cart batteries, and lied about that at trial. He perjured himself on the stand, and the court was right to say, I think that contributes to a wrongful intent finding. Now, I want to say, I think, on the ultimate finding of likelihood of confusion, it is telling that we are standing here talking about two factors, intent and actual confusion, that this court's cases say uniformly do not need to be present. First of all, intent is a factor that weighs only in favor of confusion, never against. And second, actual confusion is the best evidence of likelihood of confusion, to be sure, but not required. There are plenty of cases that where there has been no showing of actual confusion, and the court has not only affirmed a judgment of likelihood of confusion, but sometimes summary judgment of actual confusion, like in the Viacom case. I do want to go back to the profit attribution point, because what the appellants are arguing is the law in the Fifth Circuit puts the burden on the plaintiff to show that individual sales were attributable to the use of the mark. And that's simply not right. The Pebble Beach case, which is what the pattern jury instructions were based on, and I apologize for getting off on a little bit of a tangent there, the Pebble Beach case says this, quote, the Supreme Court has held that the burden is upon the defendant to show that he made no profit from the infringing use of the mark. That is from the Supreme Court's Mishawaka case. It's the same principle is in the Texas Pig Stands case, which says the burden is upon the poacher to show that they did not earn profits attributable to the use of the mark. And the Lanham Act, I will say, as a textual matter, is very clear. It says the plaintiff's burden is to prove the defendant's sales only. I want to go back to a broader point, which is, Your Honor, it says sales attributable to, right? It does not. That is a misquote from the appellants. I thought attributable is in the language somewhere. It is not. Okay, I misread it, and what the Mishawaka case says is the plaintiff discharges its burden by showing sales of the product bearing the infringing mark. That's exactly what we did at trial, and they don't say otherwise on that point. I want to take a step back to address the David versus Goliath point. First of all, if you look at the Certificate of Interested Persons, Mr. Goles is the 11th lawyer who has appeared in this matter for the defendants. This is an incredibly well-funded infringer, and it's an infringer who made a lot of money infringing. The testimony at trial was that the $4.7 million or so in profits on Trojan EV was only about a third of the business that Golf Carts of Cyprus was doing. This is not a small company. It was a small infringer. They didn't have a lot of customers. They're a non-existent company now. Not correct, Your Honor. Chapter 11. So they filed for bankruptcy. They reorganized, and Golf Carts of Cyprus, as I understand it, is still operating and still selling Mr. Nell's other brands, EV Titan primarily and Spartan EV. But in terms of David versus Goliath, this was not a rush into court situation. Mr. Nell and the defendants started selling Golf Carts in January of 2021. That's when the first shipments went out. In July of 2021, my client, Trojan Battery Company, found out about it and wrote him a letter and said, please stop. They did not stop. In September, we filed suit. They had a chance to stop then. They did not stop. Mr. Nell came to trial in June of 2023. He lied to the court about his intent. And before that, in December of 2021, the manufacturer of the Model A Golf Cart, which Mr. Nell testified at trial, was just a kind of a generic design. You could make a golf cart with these molds that didn't have Trojan EV on it. Told him, we're not going to sell you those anymore. And so what did Mr. Nell do? He could have sold EV Titan. He could have sold Spartan EV. He said, I'm going to invest one and a half million dollars of my own money. I'm going to loan it to the company to make new molds that have custom Trojan EV parts all over. That story is inconsistent with coming to this court and saying there was no value to the brand. There's no evidence that there was ever any value to the infringing brand. You don't invest one and a half million dollars to make a new model of golf cart unless you think there's something that's going to be uniquely profitable about that model. But what's the bigger point here? The district court found that Mr. Nell lied on the stand on behalf of the defendants and that he went on infringing and, in fact, increased his infringement while the case was pending. From an equitable profit, infringer profit perspective, their argument is in their brief, well, Mr. Nell is, the defendants are entitled to say to the court that they don't think there's infringement. Fine. They had their day in court. But when you spend three years of litigation racking up profits, you don't get to have your day in court, lose, and then say the district court was required to let them keep those profits. The district court has discretion under section 1117A to increase or decrease a profit award. It didn't increase it. It didn't say I found you perjured yourself, so I'm going to triple the award or double the award. It just said something very simple, which is you're not going to be allowed to profit from infringement that almost entirely occurred after you were on notice of Trojan Battery's rights. And I'll say just one more thing on that point, which is the district court found there's a joint submission of what the profits were from Trojan EV after the expert reports were done in this case. October of 2022 were expert reports. June 2023 was trial. May or March 2024 was verdict. Just between October of 2022 and March of 2024, the defendants racked up and agreed upon $2.1 million in profit from infringing the Trojan EV mark. From an equitable perspective, Maltina is very clear. American Rice is very clear. You don't have to let the infringer keep those profits. Otherwise, the playbook is clear. If you're a willful infringer, you get a letter. You squeeze every bit of profit you can, every penny you can, out of the mark until a district court tells you to stop. That was a situation in this case. And the district court correctly found that profits should be disgorged. I'll say just why my time is running low. I'll say just one very quick point on the injunction, because this is definitely on the broader end of injunctions that this court has approved. This was a situation where, and Judge Jones, to your point, the defendant was going to go right back to running a golf cart store. And so the complaint is, well, this stops a lot of uses of the word Trojan that might not relate to golf. I don't think you can read the injunction, one, without understanding that it was against defendants who run golf cart shops. And two, it's absolutely equitable to shift the burden to the defendant to stay away from the plaintiff's mark. That's the safe distance rule that this court has affirmed time and again. And to say, if you have some legitimate use that you think is going to be stopped by this injunction, you can come to the court and ask that it be modified. I see my time is up, Your Honor. Well, I'll let you, if you've got a concluding sentence, make it. We just ask that you affirm the judgment of the district court in full, Your Honor. All right. Thank you, sir. All right. Back to you, Mr. Goltz. And unless the court has any questions, I'll just begin with the evidence of passing off and palming off. Now, as I mentioned in my opening, this court's precedent is clear that mere awareness of the plaintiff has never been enough to demonstrate willfulness. And the two errors on willfulness I outlined in my opening, even Maltina, which counsel mentioned in his argument, Maltina involved efforts by the defendant to deliberately copy the label of the plaintiff's predecessor. It was intentionally trying to trade on the goodwill of the plaintiff and its predecessor. We do not have evidence of that in this case. This is from Joint Exhibit 9. Well, counsel, every case is different. Lawyers like to do that. I mean, they're all going to be different in terms of the facts in the case. Yeah, yeah, yeah. And sometimes we want to distinguish. So we get that. We've got lots of precedent in the circuit, as you have pointed out to us, and so on and so forth. So yeah. What's perhaps most telling, Your Honor, on that point is that there's never even been an allegation of palming off or passing off, let alone evidence presented. The only evidence presented on the willfulness point, again, was the mere awareness of the plaintiff and its use of the marks before golf carts were ever sold. And again, I'll point to the passage from the El Chico opinion, but I also like to note, too, recall what the record shows. The record shows that the plaintiff sent a cease and desist letter in July of 2021. Mr. Nell engaged counsel who followed up with his response to the cease and desist letter. It's Exhibit 10. Mr. Nell testified that he saw that response to the letter. What the letter referenced was that there were 111 other uses of the mark Trojan across all product categories. Now, keep this in mind. This is precisely what El Chico mentions, is that while Mr. Nell and the defendants might have known of plaintiff's use of the mark at the time they started selling golf carts, he also knew of these 111 other uses of the mark Trojan at the time, such that the plaintiff could not claim an exclusive right to any and all uses of the mark Trojan, especially for non-competing products, which is what we have here. And I'd like to go back, too, to the point I made before about what we're dealing with here. We're dealing with probabilities, not mere possibilities. Again, the only evidence of confusion that they offered, apart from Malloy's testimony, were the four emails. And I want to close this loop right here. I crunched the numbers. Four emails out of 1,262 emails. Do you know what that comes to? It's 0.3%. One-third of 1% of those emails are ones that they contend show confusion. In no universe is one-third of 1% a probability of anything. A probability of confusion is not established in this case. And what my friend said was that it was telling that we're relying on these two digits that they don't need to prove to establish a likelihood of confusion. That might be true in the abstract, but it's not true in this case. Because in this case, this district court relied on these two factors heavily in its rulings, in its disgorgement award, and its impermanent injunction. And I'll say this, too. It's apparent from the record. You heard the repeated arguments about Mr. Nell having lied. Well, you can guess what they're trying to do with that story. They're trying to use this asserted lie to support their request for attorney fees that's still pending in the district court. They're saying that this case is exceptional because perjury is demonstrated. And again, pointing back to the Lurr brothers' opinion, and pointing back to the cited evidence in the findings and conclusions, there is zero support for the adverse credibility and determination in this case. The sole document that they rely on for that credibility determination simply doesn't cut it. And what this court noted in Viacom does not support the ruling either. It is improper to infer bad faith merely based upon circumstantial evidence. What about the testimony he cited? I believe the only testimony he cited was from Mr. Nell himself about how he got his start selling golf carts, assisting Mr. Fuentes with a weekend job. And I'd also like to point to Mr. Nell's other testimony on that point, though, is that this was a weekend project. And at that time, with no background in golf carts, he was managing his three other businesses in construction, I think tools and insulation. This was merely a weekend thing. And his testimony on top of that said that each and every one of the golf carts supplied were supplied by a dealer with other branded batteries installed, and they didn't even touch the batteries. They literally cleaned the golf carts and simply resold them. All right. Thank you, Counselor. You have a red light. That concludes the arguments in this case, and it'll be submitted. Both the cases argued are interesting, to put it mildly, but we will read it all and get it decided forthwith. Before we adjourn the panel, I do want to recognize and identify we have faculty and we have students from Loyola University College of Law from the IP Clinic. And so they came to hear the scintillating arguments of counsel and their adroit ability to respond to the questions of the panel. And so hopefully they leave enriched and satisfied, but without the responsibility of having to decide the case. So at any event, we do appreciate having you here and having others to come and actually see and hear wonderful counsel to present their matters to the court. And as you can see, we are a hot bench. We've read it. We know it's not a divorce case. We do our work in advance to read the record, read the trial, all the proceedings. In the old days, we'd ask counsel, well, when we get into the record, what will we find? Well, in the modern electronics, we say, counsel, I've looked at the record and on page X. So counsel have to be able to pivot knowing that the court has already looked at a lot of what's in here. So it helps to streamline the questions. Many of the cases on our docket today, we have some non-orally argued cases that we'll discuss shortly. It doesn't mean they're unimportant. It's just that we believe, looking at them in advance, that the settled law will probably give us a way to resolve those issues. And so we'll discuss those in conference a bit later. The ones that are argued are what I call the gray area cases. And that means that maybe you know the answer, but counsel with argument are very much able to respond to questions that we have, even after reading all that. And some people, Judge Barksdale and Judge Jones probably read the whole record before coming in. But I'm going to confess, I didn't. I read significant portions. So it makes each judge really have to do your work because our colleagues are very astute. And it helps us to bring our A-game to it as well. So I appreciate both, you know, on all the panel. But the court works hard, contrary to what people might think. We've spent a lot of time preparing for this with charts and diagrams. And particularly when people cite cases that we've written, like Judge Jones's case is probably memorized all of hers. But I get fearful when somebody cites a case I was on. I'm like, oops. What did that mean? But the main point I want to illustrate to you that it is a very active bench at the Fifth Circuit in particular. You can go in the East Court room, West Court room, you'll find a duplication of very, very smart judges, very, very conscientious and very engaged in the issues, not some predetermined, the law clerks already decided the cases for. We don't always agree with the recommendations.